UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANETTE SCHOTT,                                    Case No. 11-12468

               Plaintiff,                      Victoria A. Roberts
v.                                                 United States District Judge

TRINITY HEALTH-MICHIGAN,                           Michael Hluchaniuk
d/b/a St. Joseph Mercy Port Huron,                 United States Magistrate Judge

               Defendant.
_____/

## REPORT AND RECOMMENDATION
## MOTION FOR SUMMARY JUDGMENT (Dkt. 29)

## I.     PROCEDURAL HISTORY

Plaintiff, Janette Schott, filed a complaint against her former employer,

Trinity Health-Michigan, Inc., alleging violations of the Americans with

Disabilities Act (ADA) on June 7, 2011. (Dkt. 1). According to plaintiff's

complaint, Trinity failed to accommodate her disability or engage in the

interactive process required by the ADA. (Dkt. 1). Plaintiff asserts that Trinity's

failure to make a reasonable accommodation or engage in the interactive process,

violates 42 U.S.C. 12112(b)(5)(A). *Id.* [1]

---

[1] Trinity argued in its motion that plaintiff could not prove that she was terminated on the
basis of her disability. However, nothing in the complaint suggests that plaintiff is making a
claim for wrongful termination on the basis of disability under the ADA, and therefore, this claim
will not be considered in this report and recommendation.

On May 1, 2012, District Judge Victoria A. Roberts referred this matter to the undersigned for all pretrial proceedings. On July 18, 2012, Trinity filed a motion for summary judgment. (Dkt. 29). Plaintiff filed a response on August 27, 2012. (Dkt. 32). And, Trinity filed its reply on September 21, 2012. (Dkt. 35). Pursuant to notice, the Court held a hearing on October 17, 2012. (Dkt. 30, 31). At the conclusion of the hearing, the motion for summary judgment was taken under advisement.

This matter is now ready for report and recommendation. For the reasons set forth below, the undersigned **RECOMMENDS** that defendant's motion for summary judgment be **GRANTED**.

## II.    STATEMENT OF FACTS

### A.    Plaintiff's Complaint

Plaintiff alleges that she suffers from a disability, bi-polar disorder, and that on January 4, 2010, she was given a letter restricting her work hours by her treating physician/counselor to no more than 8 hours per day with a limited amount of consecutive days scheduled to work. Plaintiff also alleges that she notified Trinity of her restrictions and that she read the letter to her supervisor over the phone. Plaintiff says that she scheduled a meeting to discuss her "request for reasonable accommodations," and that when she met with Trinity's representatives on January 14, 2010, she was terminated.

B.   Detailed Factual Background

Plaintiff was originally employed as a lab technician by Trinity in 2001.

Plaintiff worked at the Mercy Health Center, a satellite clinic, often referred to as

the "North End."  Plaintiff claims that she did not like the schedule at the clinic lab

she was assigned to, which required her to work 7 or 8 consecutive days on and

then 7 days off, and she did not like working 13 hour days, which covered the

hours of the clinic to which she was assigned.  Nevertheless, plaintiff worked the

schedule for 2 or 3 years (Dkt. 29, Ex. 12, Schott 14-21), before quitting.  Plaintiff

tried to find others to work the shift but was unsuccessful.  (Dkt. 29, Ex. 12, Schott

22-25).  There was no other shift available at the satellite lab.  (Dkt. 29, Ex. 12,

Schott 26).  Plaintiff quit in 2008 to take a lab tech position at Port Huron General

Hospital but returned to defendant's employ at her prior position, schedule, and

for lower pay shortly thereafter.  (Dkt. 29, Ex. 12, Schott 33-34).  Plaintiff claimed

she "missed" her co-workers.  (Dkt. 29, Ex. 12, Schott 30-32).  Sheri Nabozny is

the Director of Laboratory Medicine at St. Joseph Mercy Hospitals and oversees

both the laboratory at the main hospital and the North End.  (Dkt. 32, Nabozny

5-6, Ex. 12).  Nabozny worked principally at the main hospital and would visit the

North End only once or twice a year.  (Dkt. 32, Nabozny 9, Ex 12).

On December 4, 2009, plaintiff failed to properly perform a quality control

(QC) test when re-calibrating a calcium testing machine in the lab.  (Dkt. 29, Ex.

13, Nabozny 15-17).  As a result, all calcium tests reported that day,

approximately 25 tests, were reported as "low."  Plaintiff failed to "catch" the low

calcium levels, which are on the lab reports.  (Dkt. 29, Exhibit 2, lab reports; Ex.

12, Schott 82, 129-130).  Part of the lab protocol is to have another technician

check the prior day's work.  According to Trinity, the lab technician, in this case

plaintiff, per her job description, is primarily responsible for the accuracy of the

tests he/she performs.  This is because lab tests, such as calcium tests, are

automatically transmitted to physician's offices immediately on completion.  (Dkt.

29, Ex. 13, Nabozny 43-44, 61).  In this instance, the low calcium levels were

automatically transmitted to physician offices.  (Dkt. 29, Ex. 17, Affidavit of

Nabozny).  Technicians who worked on December 5 and 6 did not "catch" the low

calciums that had been reported by Plaintiff on December 4th.  As a result, on

December 7, a physician detected that all her patients had "low" calciums from

December 4 and reported such to the lab.  The physicians of all the 25 patients

who reported low calcium results were notified that the patients required

re-testing.  A letter recalling the patients for testing was issued.  (Dkt. 29, Exhibit

3).

Plaintiff was first diagnosed with bi-polar disorder when she was 10 years

old.  (Dkt. 32, Schott 72, Ex 11).  She has been taking Prozac since she was 16

years old and has been taking Lamictal in combination with the Prozac since 2003.

*Id.* Before 2003, she took Depakote along with her Prozac for the bi-polar

disorder. *Id.* Plaintiff had been able to function fairly normally as long as she was

taking her medications. (Dkt. 32, Schott 73-79, Ex 11). In December of 2009,

plaintiff began experiencing severe depression. (Dkt. 32, Schott 94-97, Ex. 11;

Ex. 1, medical records). Plaintiff's mother moved into plaintiff's home to assist

with caring for the home and her children. (Dkt. 32, Schott 94-95, Ex. 11). After

the December 4, 2009 incident, plaintiff discussed her depression and her situation

at work with her doctor and her therapist and it was determined that her

medication needed to be adjusted. (Dkt. 32, Kenny 23-27, Ex. 13). Plaintiff's

doctor changed her medication on December 17, 2009 and instructed her not to

work while she was adjusting to the change in medication. (Dkt. 32, Schott 95,

Ex. 11; Kenny 30-31, Ex. 13). Plaintiff furnished her employer a doctor's excuse

for her time off from December 17, 2009 to January 1, 2010 with the diagnosis of

Bipolar II D/O. (Dkt. 32, Ex. 2). In addition, plaintiff's therapist spoke with her

supervisor, Ann Norris, on December 17, 2009 and told her that plaintiff was

concerned about getting fired over the December 4th incident. (Dkt. 32, Kenny

28-30, Ex. 13). Norris told the therapist that managers at a higher administrative

level were reviewing the situation and would make any determination regarding

discipline. *Id.* Nabozny testified that she had set up a meeting with

Vice-President of Human Resources, Robb Gunn, to discuss the December 4

incident, but the meeting did not occur because plaintiff was on leave.  According to Nabozny, a meeting was rescheduled to occur on January 14th after Plaintiff's return.  (Dkt. 29, Ex. 13, Nabozny 21-22).

Plaintiff testified that she visited her therapist (Kenny) on January 4, 2010.  (Dkt. 29, Ex. 12, Schott 98-100).  Plaintiff testified that on January 4, 2010, her therapist gave her specific work restrictions contained in a letter.  Plaintiff claims that she called Nabozny on January 6th and read the letter to her.  (Dkt. 29, Ex. 12, Schott 155).  Plaintiff claims that she expected that she would be meeting on January 14th with Robb Gunn, Defendant's VP of Human Resources, to discuss the specific restrictions she had been given.  Plaintiff also testified that at the January 14th meeting she had the letter that had been given to her on January 4th, was going to give it to Gunn, but never had the chance because she was fired before she could give Gunn the letter from Kenny.  Plaintiff testified that she was so upset about being terminated she "lost" the letter.  (Dkt. 29, Ex. 12, Schott 102-103).  Plaintiff never produced the letter.  Kenny testified that plaintiff was not present and did not visit the clinic on January 4, 2010, that there is no entry in plaintiff's medical records showing any visit on such date, that if plaintiff had actually been treated at the clinic or seen at the clinic on January 4th, there would be an entry showing such visit, that no letter was ever issued giving plaintiff restrictions and that the medical record would show if such letter containing

Report and Recommendation
Motion for Summary Judgment
*Schott v. Trinity Health*; Case No. 11-12468

restrictions was ever issued but the medical record does not show that such letter was ever issued.  (Dkt. 29, Ex. 14, Kenny 13, 14-15, 18-19, 34).

On January 6, 2010, plaintiff was scheduled to work from 6:00 a.m. to 10:00 a.m.  (Dkt. 29, Exhibit 5, work schedule).  Plaintiff, however, did not feel she was ready to return.  (Dkt. 32, Schott 96-101, Ex. 11).  According to plaintiff, she was struggling with her confidence, was not comfortable in her position, and she was extremely tired and dizzy.  (Dkt. 32, Schott 99, 140, Ex. 11).  When her supervisor, Norris, came in to work to relieve her that day, plaintiff told her she was tired and did not know if she was ready to come back and that Norris should double check everything. (Dkt. 32, Schott 99, Ex. 11).  After leaving work, she went to see her therapist and doctor and called in sick the next day.  (Schott 100, Ex. 11).  Plaintiff returned to work on January 8, 2010 and worked her scheduled hours every day afterward until she was terminated on January 14, 2010.  (Dkt. 32, Schott 142-143, Ex. 11).

Immediately on return to work, plaintiff's first task was to calibrate equipment and perform quality control checks.  There appears to be no dispute that plaintiff failed to properly perform a quality control test on a urinalysis testing device.  A normal result for a QC test for urine specific quality should be between 1.000-1.005.  Schott wrote in a 1.10, on the QC log, an out of range QC test result.  (Dkt. 29, Exhibit 6, Exhibit 15).  Plaintiff testified that she wrote 1.10 on the QC

report and that was "an error." (Dkt. 29, Ex. 12, Schott 157). As a result, seven specific gravities for urine analysis tests done on January 6th were improperly reported. (Dkt. 29, Exhibit 7, urinalysis test results). On this occasion, plaintiff's error was caught by Norris, who reported the error. The error was reported to Lab Director Nabozny on Nabozny's return from vacation on January 11th. Nabozny communicated to Robb Gunn, V.P. of H.R. that she was "really mad" about plaintiff's error. (Dkt. 29, Ex. 8 January 11 e-mail). Nabozny spoke with Gunn and requested plaintiff be terminated. Per Nabozny, the two quality control errors made by plaintiff in a very short period of time, in Nabozny's opinion, justified termination for patient endangerment. Nabozny requested Plaintiff be terminated. (Dkt. 29, Ex. 13, Nabozny 24-25, 26-27, 28-29; Ex. 6, Gunn 18). Rob Gunn and Nabozny discussed plaintiff's errors on January 11, 2010. Gunn agreed to terminate plaintiff at the meeting that had previously been scheduled for January 14th to discuss plaintiff s error on December 4, 2009. (Dkt. 29, Ex. 16, Gunn 4-5).

According to plaintiff, without any prior warning that her job was in trouble because of the December 4, 2009 incident or having been given any notice that there was a problem with the January 6, 2010 test results, she was presented with a notice stating that she was terminated for "Errors putting patient welfare in jeopardy." (Dkt. 29, Ex 6). Plaintiff points out, however, that no one was retested as a result of the January 6th "errors." (Dkt. 32, Nabozny 99-100, Ex. 12).

Nabozny testified that she had met with Mr. Gunn and Dr. McDonald about the January 6th incident and as a result of that meeting, there was nothing that had to be done at that point for patient safety. (Dkt. 32, Nabozny 27, Ex. 12). Nabozny also admitted that she had a telephone conversation with plaintiff where plaintiff indicated that she wished to discuss an appointment she had with her doctor along with some paperwork from her doctor. (Dkt. 32, Nabozny 101, Ex. 12). Nabozny also testified to the following:

> Question: The discussion on the phone, did you tell her that that would be discussed at the January 14th meeting?
>
> Answer: No.
>
> Question: What did you tell her on that occasion?
>
> Answer: She told me that she had a doctor's appointment coming up and I told her to bring in any paperwork you got.
>
> Question: Did she indicate was she wanted to talk to you about the doctor's appointment what was the significance of that?
>
> Answer: That she had an appointment and there may be some paperwork.

*Id.* On January 11, 2010, Nabozny sent Gunn an email stating that she was very angry about the errors that were made on January 6, 2010 and reported it to him as a "huge patient safety concern." (Dkt. 32, Ex. 7, 1/11/10 email). At the same

time, according to plaintiff, she withheld information from Gunn that other

employees were clearly involved in the December 4, 2009 errors and that other

employees may also have been involved or been the source of the errors on

January 6, 2010.  Nabozny confirmed that it was she who went to Gunn with the

recommendation to terminate Plaintiff.  (Dkt. 32, Nabozny 28-29, 101, Ex. 12).

According to plaintiff, it is important to note what Gunn knew and did not know

prior to the January 14, 2010 termination meeting.  Gunn testified that he was

aware that Nabozny had not spoken to plaintiff prior to the meeting and that

plaintiff was not on any kind of performance improvement plan at that time.  (Dkt.

32, Gunn 13-14, Ex. 15).  He was also aware that there had been no specific write

up, suspension, warning or any other action taken regarding the December 4, 2009

incident prior to the January 14, 2010 meeting.  (Dkt. 32, Gunn 15, Ex. 15).  On

the other hand, at the time of plaintiff's termination, Gunn did not know the

following:

> (1)    In regards to the December 4, 2009 incident, two other employees
>         who were supposed to do back up checks failed in their
>         responsibilities.  (Dkt. 32, Gunn 19, Ex. 15).
>
> (2)    That lab policies and procedures required that lab techs check the
>         previous day's work.  (Dkt. 32, Gunn 9, Ex. 15).
>
> (3)    That several other people had made mistakes regarding the December

Report and Recommendation
Motion for Summary Judgment
*Schott v. Trinity Health*; Case No. 11-12468

4, 2009 incident or that Ms Nabozny made no recommendations that the others be disciplined, suspended or terminated because of their mistakes in the process from the same incident.  (Dkt. 32, Gunn 21-22, Ex. 15).

(4)     That the incident on January 6, 2010 had not been discussed with Ms Schott prior to the January 14th meeting.  (Dkt. 32, Gunn 37, Ex. 15).

Per Gunn, he had no information that plaintiff claimed she had a disability or suffered from a bi-polar condition.  (Dkt. 27, Ex. 16, Gunn 8).  Gunn also had no information that plaintiff had ever requested a modification of her work schedule due to bi-polar disorder.  (Dkt. 27, Ex. 16, Gunn 8, 10, 38-39).

Per Nabozny, Plaintiff's bi-polar condition was not a factor in her decision to recommend termination.  (Dkt. 27, Ex. 17, Nabozny Affidavit).  According to Trinity, plaintiff was terminated for patient endangerment under defendant's policies.  Patient endangerment is a terminable offense which not does require progressive discipline.  (Dkt. 27, Ex. 9, policies).  Gunn and Nabozny both testified that there was no discussion regarding accommodation or the ADA at the January 14, 2010 meeting.  (Dkt. 27, Ex. 13, Nabozny, 32-34; Ex. 16, Gunn 8, 10, 12, 38-39).

On January 15, 2010, plaintiff reported to Kenny that she had been terminated "due to lab errors."  (Dkt. 27, Ex. 14, Kenny 43-44).  Plaintiff filed a

charge with the EEOC alleging discrimination under the ADA. The EEOC issued

a right to sue letter on March 11, 2011, prior to completing its investigation. (Dkt.

27, Ex. 11). Plaintiff filed this suit on June 7, 2011. (Dkt. 1).

C.    The Parties' Arguments

Trinity makes several argument in support of its motion for summary

judgment. First, Trinity asserts that no request for accommodation was actually

made by plaintiff. Second, Trinity contends that even if plaintiff had made the

request for accommodation as she alleges, her request was in fact, not

"reasonable." Third, Trinity asserts that plaintiff could not perform the essential

functions of her position with or without accommodation, given that she failed to

accurately perform quality control tests that were essential to the functions of her

job and that plaintiff could not work the hours required by the position, including

the 13 hour shift necessary to cover the hours the clinic was open. Fourth, Trinity

says that plaintiff was terminated for a non-pretextual reason, her failure on two

occasions to properly perform quality control checks resulting in multiple

laboratory errors.

According to plaintiff, she was qualified for her position and able to

perform the essential functions of her job with accommodation. While plaintiff

acknowledges that she never supplied her employer with a specific written

restriction from her medical providers, she testified that she had several verbal

conversations with Ms. Nabozny regarding her request to work shorter shifts and raised in again with Mr. Gunn at her termination meeting.  Plaintiff also argues that her requests for accommodation were reasonable, based on the factors to be considered in evaluating "undue hardship."  *See Hankins v. The Gap, Inc*. 84 F.3d 797, 800 (6th Cir. 1996) and *E.E.O.C. v. Journal Disposition Corp*, 2011 WL 5118735, *5 (W.D. Mich. 2011).

Plaintiff argues that Trinity was required to consider her request for an accommodation unless the employer can show the request was unreasonable. According to plaintiff, defendant never engaged in the interactive process nor asked plaintiff to have her doctors clarify the specific parameters of her requested accommodation.  Instead, defendant claims that her request for a modified work schedule makes plaintiff unqualified for her position without any evidence, according to plaintiff, that a modified work schedule was unreasonable or an essential function of the job.  Plaintiff says that Ann Norris testified that in addition to the full time tech, there were also two part time techs and multiple phlebotomists working in the North End lab that reported to her in 2009-2010. (Dkt. 32, Norris 6, Ex. 14; Nabozny 15, Ex. 12).[2]  Further, lab techs at the main branch only worked 8 hour days instead of the 13 hours assigned to the full time

---

[2]  Notably, Norris testified that "there may have been two part-time [techs] and then multiple phlebotomists." (Dkt. 32-15, Pg ID 491, Tr. at 6).  Nabozny testified that "there was one assigned to work there a day, but obviously they can't be there seven days a week.  So there were three or four people trained to be there that would keep the lab open when it needed to be open." (Dkt. 32-13, Pg ID 470, Tr. at 15).

techs at the North End.  (Dkt. 32, Nabozny 33, Ex. 12).  Under these facts, plaintiff
contends that defendant has failed to meet its burden of proof that plaintiff's
request was unreasonable.

## III.    ANALYSIS AND CONCLUSION

### A.    Standard of Review

Summary judgment is appropriate when the record reveals that there are no
genuine issues as to any material fact in dispute and the moving party is entitled to
judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Kocak v. Community Health
Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of
Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).  The standard for determining
whether summary judgment is appropriate is "whether the evidence presents a
sufficient disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas.
Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005), quoting *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see also Tucker v. Union of
Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005).  The
court must consider all pleadings, depositions, affidavits, and admissions on file,
and draw all justifiable inferences in favor of the party opposing the motion.  *See
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);
*Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

Under Federal Rule of Civil Procedure 56, a party asserting a fact that cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declaration, stipulations, admission, interrogatory answers, or other materials; or a showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact.  Fed.R.Civ.P. 56(c)(1).[3]

B.    Legal Standards

In order to establish a prima facie case for failure to accommodate, a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.  *Johnson v. Cleveland City School District*, 443 Fed.Appx. 974,

---

[3]  Formerly, "Rule 56(e) require[d] that sworn or certified copies of all papers referred to in an affidavit must be attached to or served with that affidavit ... To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Johnson v. Memphis City Schools*, 2010 WL 1957267, *2 (W.D. Tenn. 2010), quoting, 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice & Procedure, § 2722, at 379-80 & 382-84 (1988). According to the Advisory Comments to the recent amendments, this specific requirement was omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.  Comments, 2010 Amendments to Fed.R.Civ.P. 56, subdivision (c). Notably, the language changes have not changed the standard itself. *Id*. ("The standard for granting summary judgment remains unchanged.").

982-983 (6th Cir. 2011), citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004). To be "otherwise qualified" for the job, the employee bears the burden of showing she can perform the "essential functions" of the job, with or without accommodation. *Johnson*, 443 Fed.Appx. at 983, citing 42 U.S.C. § 12111(8); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 456 (6th Cir. 2004). "If the employer claims [ ] that the disabled individual would be unqualified to perform the essential functions of the job even with the proposed accommodation, the disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir.1996).

The employee also bears the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations. *Johnson*, 443 Fed.Appx. at 983, citing *Tubbs v. Formica Corp.*, 107 Fed.Appx. 485, 488-89 (6th Cir. 2004). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer. *DiCarlo*, 358 F.3d at 419.

As the Sixth Circuit has explained, in cases in which "the plaintiff is seeking some accommodation on the part of the employer, and is claiming that he or she would be qualified to perform the essential functions of the job with such

16

reasonable accommodation, the disputed issues will be whether such accommodation is reasonable, whether such accommodation would impose an undue hardship upon the employer, and/or whether the plaintiff is capable of performing the job even with the suggested accommodation, each of which may also be resolved through direct, objective evidence." *Monette v. EDS Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt Corp., Inc.*, 681 F.3d 312 (6th Cir. 2011). Title 42 U.S.C. § 12112(b)(5)(A) states that an employer has "discriminated" against a disabled individual by:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

According to the Sixth Circuit, the language of this provision makes it clear that the employer has the burden of persuasion on whether an accommodation would impose an undue hardship. *Monette*, 90 F.3d at 1183. However, the disabled individual bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable. *Id*. The *Monette* court pointed to a Seventh Circuit case describing the employee's initial burden on this issue as showing "that the accommodation is reasonable in the sense both of efficacious

and of proportional to costs." *Monette*, 90 F.3d at 1183, quoting *Vande Zande v.*
*State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir. 1995). The court
also observed that nothing in the statute alters the burden the disabled individual
bears of establishing that he or she is capable of performing the essential functions
of the job with the proposed accommodation. *Monette*, 90 F.3d at 1184. That is,
"if the employer claims that a proposed accommodation will impose an undue
hardship, the employer must prove that fact. If the employer claims instead that
the disabled individual would be unqualified to perform the essential functions of
the job even with the proposed accommodation, the disabled individual must
prove that he or she would in fact be qualified for the job if the employer were to
adopt the proposed accommodation." *Id.*

C.   Analysis

The undersigned is going to assume, for purposes of this analysis, that
plaintiff requested the accommodations of a shift that does not exceed 8 hours per
day and that does not require working 7 days consecutively. The next question is
whether that request was "reasonable." Defendant argues that plaintiff failed to
establish, as it is her burden, that this request is objectively reasonable. Plaintiff
suggests that because this type of accommodation is identified in the regulations,
that it is *per se* reasonable. Neither party has it exactly right. The Sixth Circuit
explained in *Monette* that, while some courts have distinguished cases in which an

employee claims that a particular job requirement is not essential for satisfactory job performance from those in which an employee seeks a reasonable accommodation on the part of the employer, and while the claims may technically differ analytically, as a practical matter, however, these cases are virtually indistinguishable. *Id.* at 1183, n. 8. "In either case, the plaintiff will have the burden of establishing that he or she is otherwise qualified to perform the essential functions of the job, absent the challenged job criteria or with the proposed reasonable accommodation. The employer then bears the burden of proving that a particular job requirement is essential as a business necessity, or that a proposed accommodation imposes an undue hardship upon the employer." *Id.*

In this case, even assuming that plaintiff has satisfied her burden, the undersigned concludes that Trinity has shown that the accommodation requested by plaintiff imposes an undue hardship on Trinity. The availability of an accommodation that is "reasonable" must be measured against the "hardship" such accommodation would cause the employer. That hardship impact may be direct on the employer or indirect through its impact on the other employees. *Leonce v. Calllahan*, 2008 WL 58892, *4 (N.D. Tex. 2008), citing *Weber v. Roadway Express*, 199 F.3d 270 (5th Cir. 2000); *Bruff v. North Mississippi Health Services*, 244 F.3d 495, 501 (5th Cir. 2001). Furthermore, the degree of "hardship" maybe quite small so long as it is more than *de minimis*. *Id.* "Any cost in efficiency or

wage expenditure that is more than *de minimis* constitutes undue hardship... [t]he cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to religious conflict can amount to undue hardship." *Id.*, quoting *Lee v. ABF Freight System*, 22 F.3d 1019, 1023 (10th Cir. 1994).[4]   The impact must be measured on a case by case basis.  *Id.*

"A modified work schedule may constitute a reasonable accommodation in certain circumstances." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004).  To be reasonable, the modification should "eliminat[e] the conflict between" the employer's scheduling requirements and the employee's needs, without imposing "a significant work-related burden on the employee without justification."  *Cosme v. Henderson*, 287 F.3d 152, 159 (2d Cir. 2002) (Title VII religious practice accommodation).  However, "'reasonable accommodation' does not mean elimination of any of the job's essential functions." *Wernick v. Fed. Reserve Bank*, 91 F.3d 379, 384 (2d Cir.1996), quoting *Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir.1991).

Nabozny attested in her affidavit that the North End laboratory offers shifts of seven days on, seven days off, with some 13 hour shifts for managers.  (Dkt. 29-5).  She explained that two employees, Janette Schott and Anne Norris, worked

---

[4]  Notably, the responsibilities of employers as to reasonable accommodation and undue hardship are the same in ADA and religious accommodation cases. *Leonce*, at *4.

those shifts.  *Id.*  According to Nabozny's affidavit, while the laboratory could cover the shifts on a temporary basis for employee leave, they would not force someone to cover the hours or require regular overtime to cover the hours. Nabozny also explained that they would have to hire a part-time employee to work five hours per day and two days per week to cover the time that Schott was not able to work.  *Id.*  Nabozny also attests that, in January 2010, there was no vacancy at the main hospital or another laboratory in the hospital system in which to place Schott.  *Id.*

In the view of the undersigned, requiring another employee to "swap" jobs with plaintiff or requiring Trinity to hire another part-time employee and/or re-arrange the entire schedule at the North End is far more than *de minimus* hardship. Plaintiff has not offered any evidence to rebut the facts presented by Trinity or offered any evidence that accommodating her scheduling needs in the North End was, in fact, a reasonable accommodation.  Plaintiff's argument also suggests that because people at the main lab worked eight hour shifts, it would have been reasonable to place her in a position at the other lab.  It is true that an employer may also accommodate an otherwise qualified individual by reassigning that individual to a vacant position.  *Bratten v. SSI Services, Inc.*, 185 F.3d 625, 633-34 (6th Cir. 1999).  However, it is plaintiff's burden to show that such positions existed and were vacant at the time her employment was terminated.  *Monette*, 90

Report and Recommendation
Motion for Summary Judgment
*Schott v. Trinity Health*; Case No. 11-12468

F.3d at 1186.  Plaintiff has not satisfied this burden or even attempted to rebut the evidence that no such vacancy was available.

Plaintiff also claims that defendant failed to engage in the interactive progress in violation of the ADA.  There is little dispute that defendant did not actually engage in the interactive process, given its position that plaintiff failed to even notify them of the request for accommodation.  However, even assuming that plaintiff requested an accommodation, this does not necessarily mean that Trinity violated the ADA.  As an initial matter, "an interactive-process argument simply does not create an independent ground to support an ADA violation beyond standard reasonable-accommodation analysis."  *Wardia v. Justice and Public Safety Cabinet Department of Juvenile Justice*, 2013 WL 28094, *4 n. 1 (6th Cir. 2013), citing *Lafata v. Church of Christ Home for the Aged*, 325 Fed.Appx. 416, 422 (6th Cir. 2009).  Indeed, "[f]ailure to engage in this 'interactive process' cannot give rise to a claim for relief ... if the employer can show that no reasonable accommodation was possible."  *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005).  Additionally, an ADA plaintiff has the burden of establishing the existence of "specific reasonable accommodations" that the employer has failed to provide.  *Memmer v. Marin County Courts*, 169 F.3d 630, 633 (9th Cir. 1999).  Plaintiff's failure to engage in the interactive process claim fails for the same reason as her failure to accommodate claim fails.  That is, she has not

identified a "specific reasonable accommodation" that Trinity failed to provide and Trinity has essentially shown, via its undue burden proofs, that no reasonable accommodation was possible.

Based on the foregoing, Trinity is entitled to summary judgment on plaintiff's claims for failure to engage in the interactive process and failure make a reasonable accommodation. Thus, none of the other arguments raised by Trinity need be addressed.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendant's motion for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 22, 2013            s/Michael Hluchaniuk
                                  Michael Hluchaniuk
                                  United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I certify that on January 22, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: Heidi T. Sharp, Rex A. Burgess, and David B. Gunsberg.

                                  s/Tammy Hallwood
                                  Case Manager
                                  (810) 341-7887
                                  tammy_hallwood@mied.uscourts.gov